## SAMUELSON v. TRIBUNE, ET AL.
(No. 1660; Feb. 16, 1931; 296 Pac. 220)

For the plaintiff in error there was a brief and an oral argument by *H. S. Ridgely*, of Cheyenne, Wyoming.

For the defendants in error there was a brief and oral arguments by *William E. Mullen* and *Jos. C. O'Mahoney*, of Cheyenne, Wyoming.

RINER, Justice.

This is a case wherein a judgment of the District Court of Laramie County comes before us upon proceedings in error, a review thereof having previously been sought by the method of direct appeal. That appeal was dismissed for failure to file the record in this court within time as the law directs. (Samuelson v. Tribune Publishing Co., 41 Wyo. 487, 287 Pac. 83.) The cause has been argued and submitted both upon a motion to dismiss the proceedings in error and upon the questions arising upon the record through the claim of plaintiff in error that the judgment is erroneous. It becomes necessary, therefore, to consider first the motion to dismiss.

The action below was instituted by Samuelson against the Tribune Publishing Company and J. C. Thompson, to obtain claimed damages alleged to have been inflicted on account of the publication by the defendants of an alleged libelous article concerning him. The trial court sustained a demurrer to his petition, and, as he elected to abide by his pleading, on June 3, 1929, entered a judgment dismissing the action at plaintiff's cost, and allowed him due exception to the ruling. Plaintiff then undertook to prosecute proceedings by direct appeal to secure a review of this judgment by this court, wherein, after argument and submission of the cause, the appeal—our case No. 1626—was, on April 29, 1930, dismissed, for the reason above mentioned, and without any consideration on our part of

the questions raised by the specifications of error therein filed. The order made in the case, as shown by our mandate appearing in the present record, was only that:

"This cause having been heretofore taken under advisement, and the court, being now fully advised in the premises: It is ordered, for the reasons stated in the opinion herein this day delivered and filed, that the appeal in this cause be, and the same is hereby, dismissed at the cost of plaintiff and appellant."

No petition for rehearing was filed by appellant. On May 31, 1930, Samuelson, as plaintiff in error, filed his petition in error here against the defendants in error, complaining of the judgment entered on June 3, 1929, as aforesaid. Summons in error was duly issued and served, and the necessary steps required by law to perfect the proceedings in error appear to have been in all respects taken.

Defendants in error have moved to strike the petition in error from the files and dismiss these proceedings for review, on the grounds, in substance, that the decision of this court relative to the previous appeal in the case, had the effect of an affirmance of the judgment of the trial court, and that Samuelson, having heretofore elected to prosecute his remedy by direct appeal from the judgment in question, thereby waived all right to resort to another remedy, viz. proceedings in error, to review the same errors and judgment as were involved in the appeal. The real question then to be determined here, is whether, after a party has endeavored to secure the review of a judgment by direct appeal to this court and through the failure to file his record here as the law requires suffers only a dismissal of the appeal without more, he may then, the one year limitation thereon permitting, prosecute proceedings in error and obtain a review of that judgment on the merits.

This court does not appear to have passed upon exactly this point. In Boner v. Fall River County Bank, 25 Wyo. 260, 168 Pac. 726, 727, it was held that a dismissal of proceedings in error for failure to file brief as required by rule 15 of this court or for other causes not affecting the merits, is not legally an affirmance of the judgment so as to prevent a second proceeding within one year after the rendition of the judgment or final order of which complaint is made. In the course of the opinion announcing that conclusion it was said:

"We are of the opinion that under our statute and rule on the subject a dismissal of proceedings in error for the failure to file briefs or for other cause not affecting the merits of the case is not in law an affirmance of the judgment, strictly speaking. To affirm is to 'confirm, or ratify; to maintain as true.' (Webster's New International Dictionary.) It implies an affirmative act on the part of the appellate court — a consideration and determination of the merits of the controversy—and not merely for the court to decline to consider the matter by reason of the failure of plaintiff in error to prosecute his cause with diligence or in accordance with the established rules of practice. 'The effect of the dismissal of an appeal is, as a general rule, to leave the case as if there had been no appeal. But a dismissal will not authorize a second appeal after the time limited for appealing.' (Elliott's Appellate Procedure, Sec. 535.) 'In the absence of some contravening statutory provision, it has been very generally held, that, where an appeal or writ of error has been dismissed voluntarily or by the court for failure to comply with some requirement of the law governing the proceeding rendering the appeal ineffective, a second appeal or writ of error is not barred if taken in due time.' "

Counsel for respondent cite the case last mentioned and comment concerning it that there no attempt was made to resort to another remedy, the case being only a second attempt to pursue the same remedy. But no substantial reason would seem to be submitted why the mere dis-

missal of an appeal for failure to obey the law and rules of procedure should result in the affirmance of the judgment below so as to prevent proceedings in error when the latter are subsequently and in apt time undertaken to be prosecuted concerning it. Indeed, it is conceded that "the rule seems to be that a second appeal may be commenced where the first appeal proceedings are defective, if such second appeal be commenced within the appeal period as prescribed by statute." In the light of the decision of the Boner case, supra, and the language just quoted from the opinion filed therein, it appears reasonably clear, as we view the matter, that it was not then thought that the consequences of a dismissal otherwise than upon the merits were as insisted upon here by the defendants in error.

The case of Mitter v. Black Diamond Coal Co., 27 Wyo. 72, 191 Pac. 1069, 1070, 193 Pac. 520, has also been cited. In it we find this language:

"The two methods provided by our statutes to be pursued to obtain a reversal, modification or vacation of a judgment of the District Court by the Supreme Court are entirely separate and independent methods, either of which a party may elect to pursue; but whether or not after bringing the cause to this court by one method *and while that case is still pending* he can also commence proceedings in this court by the other method we entertain grave doubts. But as that question has not been raised we do not decide it. * * * While a party may bring the cause to this court by either of the two methods at his election, if he has preserved the proper record, he cannot maintain both at the same time."

As dealing inferentially with the matter before us, the significant phrase in the quotation just made has been italicized.

In Finley v. Pew, 28 Wyo. 342, 205 Pac. 310, 313, 206 Pac. 148, this court, speaking of the two methods of ob-

taining a review here, viz. the direct appeal and proceedings in error, said this:

"We think that the statute preserves to a party the right to bring an action here by petition in error, although the other party to the case comes up here by direct appeal. No method of assigning cross-errors is provided by the direct appeal statute. Hence where one party has sought review of the case by direct appeal, then the other party, if compelled, as contended by counsel for defendant, to seek review of errors complained of by him in the same proceeding, must serve notice of appeal and file specifications of error the same as his opponent. But grave injustice might in such case often result, since one party, by serving his notice of appeal at the last moment, might prevent his unprepared opponent who intended to come here by petition in error, from serving any such notice within the time provided by law, and thus deprive him of the right of having the errors of which he complains reviewed."

Again in Barrett v. Whitmore, Admr., 28 Wyo. 495, 207 Pac. 71, 73, it was definitely remarked concerning the Boner case mentioned above, that:

"We, however, held in the case of Boner v. Bank, supra, that a dismissal is not, of itself, equivalent to an affirmance of the judgment, and that where a case is dismissed in this court, without having passed on the merits, a second proceeding for review may, within the time provided by law, be prosecuted. We adhere to the holding of that case, and that implies that this court is inclined favorably to reviewing a case, other necessary requirement being complied with, where a case has not in this court been disposed of on its merits."

The language of the opinion in Megown v. Fuller, et al., 37 Wyo. 61, 258 Pac. 1018, 1019, is relied on by respondent, where it was said:

"It may be conceded, that according to the generally accepted rule, the same party may not, ordinarily, pursue

two separate and independent methods for the appellate review of a judgment, but must elect between them, in the absence of a statute to the contrary. Horton v. Peacock, 1 Wyo. 57.''

That statement, while not necessary to a decision of the case, does not seem to do more than reiterate the doctrine of the Mitter case, supra, which it immediately thereafter proceeds to set forth. However, it is urged that the rule announced in Horton v. Peacock, 1 Wyo. 57 — the case cited in the preceding quotation—is well established law in this state and that that decision is decisive of the question now being considered.

The opinion in the Horton case was announced in the course of the July term, 1872, of the Supreme Court of Wyoming Territory. At that time there was provision made in the law for appeals from the District Court to the Supreme Court as well as for proceedings in error (Laws 1869, Titles XXIV and XXIX). The legal requirements then governing the right of review by appeal were quite different from those now in force, and appear to have been repealed by an act of the territorial legislature approved December 11, 1873 (Compiled Laws 1876, p. 131). By Section 723 of the chapter (Title XXIX supra) dealing with appeals, it was in part enacted that:

"No appeal shall be allowed as provided in this title until there is filed by or on behalf of the party applying therefor, an undertaking with two or more good and sufficient sureties.''

The Territorial Supreme Court was authorized by law to prescribe its own rules of practice and these rules were, by law, declared to be as binding upon the parties practicing and having business therein ''as though the same were enactments of the legislative authority of this territory.''

When the Horton case came before the court for the first time (Horton and Reel v. Peacock, 1 Wyo. 39), there was in force rule 12 of the court entitled ''Of Unperfected Appeals, Etc.'' and, so far as pertinent here, it read:

''When notices of appeals or writs of error have been filed and undertakings entered into in the District Courts —but where the appellants or parties applying by writs or petitions in error fail to enter their appeals or to properly enter their errors in this court, the appellee or defendant in error by himself or counsel may apply to the court on or after the first day of the term for a rule on the appellant or plaintiff in error to be served on him or his counsel on the record in the court below, to show cause why the appeal or writ or petition in error should not be stricken off and the judgment affirmed.''

When the judgment of the District Court was rendered in favor of Peacock and against Horton, the latter served a notice of appeal therefrom, but failed to file the undertaking required by Section 723, supra. Peacock, by his counsel, moved in the appellate court to dismiss the appeal on account of this dereliction, and the court granted the motion. However, as pointed out in the report of the case on its second appearance in the court (Horton v. Peacock, 1 Wyo. 57), the latter ''not only struck off the appeal but directed a procedendo to the court below directing proceedings to cover the amount of the judgment, with interest and costs,'' the order in that respect reading:

''Now comes the said Amos Peacock by his attorney and moves the court to dismiss the appeal and after argument of counsel it is considered and adjudged that the said appeal be dismissed and be remanded to the court below with an order to carry into effect its judgment.''

It will be observed that the action of the court was quite in harmony with the positive requirements of its rule 12 quoted above regarding unperfected appeals.

In passing, it may be noted that the case is incorrectly reported in 1 Wyo. 39, as no judgment was obtained against A. H. Reel, the other defendant below, and the first proceeding was undertaken by appeal and not by proceedings in error—as is correctly stated in the report of the case on error at 1 Wyo. 57.

Thereafter application was made by appellant for leave to file a petition in error, which was granted, with the understanding that this action was not to be final, but would be a question for consideration at the next term of court. The defendant in error then moved to dismiss the error proceedings, and, by a divided court, the motion was sustained and the case dismissed.

It is hardly necessary to point out that the situation thus presented by the Horton case differs materially from that at bar. We have no such rule as rule 12 of the territorial court, and our order of dismissal, in case No. 1626, 41 Wyo. 487, 287 Pac. 83, clearly did not direct the trial court to "carry into effect its judgment," as did the order made in the Horton case. There the practice evidently required an affirmance upon the dismissal of an unperfected appeal—here no such requirement exists and nothing of the kind was done.

It is not so very difficult to see that where the practice under a statute or a rule of court requires an unqualified affirmance of the judgment of the court below upon the dismissal of an unperfected appeal or writ of error, that the right to a second appeal or writ of error relative to the same judgment might well be denied. Otherwise the second proceeding would be in effect an effort to review an affirmative action on the part of the appellate court directing enforcement of the judgment below, in defiance of the court's own rules or the statute. The authorities relied upon in the opinion in the Horton case dismissing the proceedings in error are practically all cases either

where the statute required an affirmance by the appellate court of the judgment below on a dismissal being suffered for procedural defects or where there had been a judgment of affirmance on the merits. The true import of the case of McConnell v. Swails, 2 Scam. 571, also cited in the opinion as authority for the territorial court's action, has been fully explained in the comparatively recent case of People ex rel. Strother v. Sleight, 302 Ill. 45, 134 N. E. 65, 66, through the use of the following language:

"Notwithstanding the fact that the case of McConnel v. Swailes, 2 Scam. 571, and the decision of the court were made clear in Garrick v. Chamberlain, 97 Ill. 620, and has been the consistent practice ever since, the case is cited in the brief of defendants in error as sustaining their plea. The case of McConnel v. Swailes was an action of debt on a bond given upon obtaining a certiorari to bring up to the circuit court a judgment rendered by a justice of the peace. The condition of the bond was to prosecute the appeal and pay the debt and costs in case the judgment should be affirmed on the trial of the appeal. The court decided that the dismissal of the appeal was equivalent to the technical affirmance of the judgment so as to entitle the obligee to claim a breach of the condition. In Garrick v. Chamberlain a motion had been made in the appellate court to dismiss the writ of error because it appeared upon the face of the record that an appeal had been prayed and allowed from the circuit court to this court and the appeal perfected. A reply to the motion set forth that the appeal taken to this court had been dismissed. The motion was treated as a plea in abatement to the writ, which it would have been if the dismissal of the appeal had been an affirmance of the judgment. The court held that the dismissal of the appeal was only equivalent to an affirmance of the judgment for the purpose of a remedy on the appeal bond, and from that time to this it has been the uniform practice of the court where an appeal has been dismissed without a decision on the merits of the case, to regard the dismissal as not a bar to a writ of error."

Our conclusion, accordingly, is that the Horton case is quite distinguishable from and not an authority decisive of the case at bar. But if it can, in any way, be construed as holding as a general proposition of law that the mere dismissal of an appeal for defects in perfecting the same operates as an affirmance of the judgment so as to preclude the prosecution of error proceedings instituted properly relative to the judgment complained of, and in due time, we consider that it has been overruled on principle by the Boner case, supra, and we must decline to approve or to follow it.

We are cited to 7 Ency. of Pleading and Practice 854, but there, after announcing the rules that both appeal and error proceedings may not ordinarily be prosecuted simultaneously, and that where an appeal has been taken and prosecuted to a judgment of affirmance, or reversal, a writ of error cannot thereafter be maintained, the text states:

"If, however, the appeal has been abandoned, or dismissed because not perfected in time, or for want of prosecution, or for want of jurisdiction, the appellant is not estopped from suing out a writ of error."

And this statement we apprehend to be the rule dictated by fairness and sustained by reason and the better authority.

In Cahill v. Cantwell, 31 Nebr. 158, 47 N. W. 849, we find it said, concerning the point under discussion:

"The sole question to be determined is this: Where an appeal is dismissed on motion of the appellee because the same was not taken within the statutory time, is the appellant estopped from prosecuting a petition in error to reverse the same judgment? It may be stated as a general proposition that an appeal duly taken and docketed in time in the appellate court is a waiver of all errors and irregularities occurring prior to the entry of the judgment

appealed from. In the case at bar the appeal was not perfected in time, and the attempt to appeal did not bar the right of the plaintiff in error to have the judgment of the county court reviewed on error. This rule has been recognized and applied by this court in several cases, by permitting petitions on error to be filed in cases brought to the Supreme Court upon appeal, where appeals have been dismissed because not taken in time.''

The rule is very well stated in the opinion of the court in Helm v. Boone, 6 J. J. Marshall (Ky.) 351, 22 Am. Dec. 75, thus:

''If Boone and Talbot failed to take a transcript of the record, and lodge it in time with the clerk of this court, but suffered their appeal to be dismissed, is the order dismissing his (their) appeal equivalent to an affirmance? An appeal has the effect to terminate the action of the inferior tribunal in the cause, until the appeal is disposed of. When it is disposed of by an affirmance, then the inferior tribunal is authorized to proceed and execute the decree. A dismissal of an appeal by the appellate court has the same effect. It authorizes the inferior court to proceed to execution. Therefore, as it regards all practicable purposes, a dismissal and an affirmance are equivalent. But notwithstanding they are the same as it regards the execution of the decree of the inferior court, there is still this important difference between them,· an affirmance upon an appeal would be a bar to the prosecution of a writ of error, whereas the dismissal of an appeal would not be.''

Similarly, in Rice v. Reed, 29 Ark. 320, it was said:

''It has been well settled in this court that where an appeal has been taken in the court below, and dismissed by this court without a hearing upon the merits, that a writ of error would lie, and under the said practice an appeal might be granted by the clerk of this court.''

Again, in Smith v. Morrill, 11 Colo. App. 284, 52 Pac. 1110, 1111, the same conclusion was reached, the court saying:

"The failure of appellant to file the record within the time required by law rendered her liable to the penalty prescribed by law for such failure, namely, a dismissal of the appeal, and was a sufficient waiver on her part of her rights under the appeal. If anything further was necessary, the subsequent suing out of the writ of error showed a positive election on her part to pursue that form of remedy alone. By suing out the writ of error she therefore was not and is not pursuing two appellate remedies at the same time. For these reasons, we think that the plaintiff in error has a proper standing in this court, and the motion to dismiss the writ of error will be denied."

So Bloyd v. Hartman, 223 S. W. (Mo. App.) 676, is to the same effect, as is evidenced by the following language:

"As the writ was sued out within a year from the rendition of the judgment in the case, it was applied for and granted within due time. (See Section 2056, Revised Statutes 1909.)

"In Hill v. Keller, 157 Mo. App. 710, loc. cit. 718, 139 S. W. 523, it is held that when an appeal has been dismissed by an appellate court, a writ of error may be sued out within one year after the rendition of the judgment by the trial court. The fact that the appeal previously taken had been dismissed by appellant, now plaintiff in error, in no manner concludes the right to a writ of error."

See also Broyles v. State Highway Commission, 8 S. W. (2nd) (Mo. App.) 1021; Missouri Securities Corporation v. Morris Wentworth Bank, (Mo. App.) 24 S. W. (2nd) 703; Brillhart v. Beever, (Tex. Civ. App.) 198 S. W. 973; Blanchard v. State ex rel. Wallace, 29 N. M. 584, 224 Pac. 1047; Belleville Enamelling and Stamping Co. v. Carbine, 224 Ill. App. 234.

The motion to dismiss must, accordingly, be denied.

The record before us, upon the errors assigned, which must now be considered, presents the sole question of whether the trial court ruled correctly in sustaining the demurrer of the defendants to the plaintiff's petition.

434

That pleading, after alleging the corporate existence of the defendant Tribune Publishing Company, that it owns and publishes a paper known as Wyoming State Tribune Cheyenne State Leader of Cheyenne, Wyoming, and that the defendant J. C. Thompson is its editor and has charge of the publication of the paper, charges that, on the 3rd day of January, 1929, said defendants:

"Maliciously published of and concerning, the plaintiff in the said newspaper of the said Tribune Publishing Company, which said newspaper had an extensive circulation, and was then widely circulated by them, the following false, malicious and defamatory matter, to-wit:

" 'PROSECUTOR BLAMES JIM MERRILL'

"Acquittal in Samuelson Case Laid to State's Star Witness by County Attorney Mentzer. Freeing of Defendant Who Offered to Plead Guilty of Manslaughter Causes City to Seethe with Comment.

"Not since the Tom Horn Case, or the trial of J. Warren Jenkins for the 'Indian club' uxorcide, has a homicide trial caused such a furore in Cheyenne as has that of 'Swede' Samuelson since the liberation, a few days ago, of the slayer of Nick Hudson.

"Hudson was killed with a knife during a brawl with Samuelson at the Owl cigar store, a reputed 'speak-easy,' October 11, Samuelson was charged with, and was brought to trial last Monday on a charge of murder in the first degree. At the conclusion of the presentation of the state's case by Prosecuting Attorney Roche S. Mentzer, the defendant's counsel, H. L. Ridgely, moved that Judge Clyde M. Watts direct a verdict of acquittal. The court granted the motion and Samuelson was set free.

"Since then the city has seethed with discussion of circumstances of the case and criticism of Samuelson's liberation without punishment for an admitted homicide. Everywhere—on the streets, in store and restaurant, in hotel lobbies, in the corridors and suites of office buildings, at club and other gatherings—the case has been and is being discussed, with expression general that a miscarriage of justice took place.

"A predominating note has been expression of amazement that in a case in which the defendant offered to

plead guilty of manslaughter the state's case against him should have been of such character that the court was constrained to grant the defense's motion for a verdict acquitting of guilt in any degree whatsoever. Discussion was taken cognizance of the obvious interest of the 'bootlegging fraternity' in Samuelson's fortunes and reports that bootleggers contributed to a fund for his defense. Innuendos of ugly inference have flavored much of the discussion. There has been emphatic voicing of indignation that one involved as Samuelson was involved should be able to go 'scott Free.'

"R. S. Mentzer, county and prosecuting attorney, said Thursday that the case against Samuelson collapsed when James 'Jim' Merrill, who was expected to be the star witness for the prosecution, on the witness stand during the trial last Monday, told a story materially differing from the testimony which he gave at the coroner's inquest the day following the fatal stabbing.

"At the inquest Merrill's testimony indicated that Samuelson had made a definite lunge at Hudson, a moment before the latter fell, dying from a knife wound. In a statement made by Samuelson soon after his arrest he admitted that he held a knife. At the trial Monday Merrill would testify only that he had seen Samuelson and Hudson 'come together' and that Hudson had fallen. He was unable to testify, he asserted, that an object which he had seen in Samuelson's hand was a knife. Merrill's testimony at the coroner's inquest indicated, that in the clash with Hudson, Samuelson had been the aggressor, but when the witness was interrogated at the trial Monday he declined to testify to this effect.

"The official stenographer's report of Merrill's testimony at the coroner's inquest contains the following:

"On the stand, George Guy, assistant county attorney, asked:

"Q. Did you see a weapon in Samuelson's hand?

"A. Yes, sir.

"Q. What was the weapon?

"A. A pocket knife, not a pocket knife, but a big knife.

"Q. How was he holding the knife or just what happened as near as you could say?

"A. He did not hold it a second.

"Q. Did you see him take it from his pocket, Mr. Merrill?

"A. No, I did not see him take it from his pocket. He came around with it this quick (illustrating) and the show was over; that is as fast as the work was.

"Q. Where were you sitting at the time?

"A. Here.

"Q. At the south end of the room?

"A. Yes, and Sam was standing here, and the other man was standing here (indicating) and they were looking at one another awful hard, and a bang, and the show was over.

"Q. You saw Sam strike Hudson with the knife as they stood there?

"A. No, I would not say that, and I will tell you why: Sam had the knife but he hit so quick that I could not swear that he hit Hudson with the knife because he went over so quick and he was dead. I didn't know whether he hit in the jaw and broke his neck or what it was.

"Q. You are positive that Sam hit Hudson with something; you are sure of that?

"A. Oh yes.

"The differences between Merrill's testimony at the inquest and his testimony at the trial is a matter that has been much discussed, with much speculation regarding possible reasons for differences.

"Merrill, now a resident of San Diego, California, had a checkered career in Cheyenne years ago. He was reared in this city. For sometime he was a bartender at the old Mozart, a saloon of unsavory repute. He also had some experience as a prizefighter, and a reputation as a gambler. He worked as a butcher at various times.

"About nine years ago just before he left for California, Merrill and Samuelson are said to have engaged in a crap game at Eagles hall in which it was said that Samuelson lost something over $500.00. The two, it is related, then started a stud-poker game in which Samuelson won back the money he had lost in the dice game and with it all of Merrill's cash. The game continued and borrowed money, a diamond ring and a diamond stud belonging to Merrill are said to have gone to Samuelson before the game broke up.

"Some days later it is said Samuelson and Merrill had an argument over a blackjack game and Merrill, it is re-

lated, 'went for his gun.' Before he could fire, it is related, the gun was knocked from his hand by a bystander. Merrill subsequently left for California and had not been seen in Cheyenne until sometime shortly before the killing of Hudson in the Owl cigar store.

"This disagreement between Samuelson and Merrill was to have been one of the items in the defense of Samuelson at his trial. As a matter of fact, much of it was brought out by defense counsel in his cross-examination of Merrill Monday, but emphasis of the fact was not made necessary when the testimony of the star witness failed to make a case for the prosecution.

"Merrill stayed in Cheyenne after the Hudson killing until the night of November 7, when he left for San Diego. As the time for trial neared, County Attorney Mentzer feared that Merrill would not be here, and a warrant was sworn out charging Merrill with being an accessory after the fact. Merrill was located through information supplied by a sister.

"San Diego police placed him under arrest, and Sheriff George J. Carroll went to California for the man.

"Merrill and Carroll returned to Cheyenne and three or four days before the time of the trial County Attorney Mentzer insisted that the witness be kept under constant observation. Members of the sheriff's office kept him under surveillance to see that he stayed in Cheyenne and to see that he did not so freely imbibe of illicit liquor as to be unable to take the witness stand.

"One rumor that has been prevalent in the streets is that Merrill took a diamond ring back to California with him when he left last Tuesday. The same rumor has it that the ring is the one that Samuelson won in the stud-poker game almost a decade ago.

"Samuelson at one time was a steam shovel engineer for the Union Pacific. He has not been employed by the railroad for some time. Last spring he was arrested on a federal charge of liquor possession. He entered a plea of guilty to the charge on April 20, 1928, and was fined $200.00 without costs. The fine was paid the same day.

"A deal of the speculation that has been rife since Samuelson walked from that district courtroom a free man, has dealt with the why and wherefore of the interest of bootleggers in the case. This speculation had taken cognizance of a report that a fund of $1800.00 was contributed

by bootleggers and others to finance the defense of Samuelson against the murder charge. Among suggestions in the public discussion was that possibly Samuelson 'knew too much' about the liquor traffic and gambling in Cheyenne and that persons engaged in, or otherwise connected with the liquor traffic and gambling were anxious that he be freed because of fear that, should he be convicted, he would 'talk' and bring disaster to those regarding whom he informed. An observer of the spectators in the court room when Samuelson's trial opened said that the audience 'looked like a convention of bootleggers.'

"3. That said publication of said paper was read by many persons in the City of Cheyenne, Laramie County, State of Wyoming and elsewhere.

"4. That in and by said words and matter hereinabove quoted and set forth and so published by the defendants as aforesaid the said defendants, among other things intended to, and did accuse the plaintiff of, and then and there and thereby intended to convey, and did convey, to the readers of said newspaper, of and concerning the plaintiff and which was by said readers so understood, each and all of the following:

"(a) That the said plaintiff was liberated without punishment for an admitted homicide in violation of the law of the State of Wyoming.

"(c) That said plaintiff committed the crime of subornation of perjury in violation of the law of the State of Wyoming."

Damages are alleged in a specified sum and judgment is prayed in that amount.

It is contended that the petition is insufficient, in that the published article is not libelous *per se,* and that as no special damage is alleged, the demurrer was properly sustained. In determining whether this contention may be allowed, the prior decisions of this court would in most respects appear to be all that need be consulted.

The first decision pertinent to the case in hand is that of In re McDonald, 4 Wyo. 150, 33 Pac. 18. That was a case where the sufficiency of an information for criminal libel was involved. The defendant was charged with un-

lawfully and maliciously writing and publishing a certain false and malicious libel of and concerning one **Walter L. Powell**, ''of the tenor following:

''Green River, Wyo., Feb. 5th, 1891.
''To General Manager H. H. Clark, U. P. R. R.
''Sir,—The robberies of company property (from sealed cars) are as brisk as ever. The thieves are waxing wealthy and bolder. As an instance last Saturday night (the 31st ult.), about 6 o'clock, Martin Cleary, an ex-employe, threw a load of coal from a coal car, and in about an hour brought around a team, loaded the coal, and took it away. Arrest the thieves, they don't care; they can get out of jail here when they want to. Referring to the last escape of prisoners, one of whom was held for robbery from the company, the sheriff now admits that he turned them out of the cage in the morning. There is no mystery about their escape. One of the receivers (ex-Constable Powell) was entrusted with a key to the jail, but even had he opened the outer doors the prisoners could not have got away if the sheriff had not turned them out of the cage. The sheriff went to Rock Springs early that day and away until night. Charley Wilson, engineer, now in hospital at Ogden, knows a good deal about the robberies and robbers. He had charge of the switch engine here.

Nemo.''

The information then alleged:

''Meaning then and therein said writing hereinbefore set forth that the said ex-Constable Powell, meaning the said Walter L. Powell, did then and there commit the crime of receiving stolen goods, knowing the same to have been stolen, and also in said writing then and there meaning that said ex-Constable Powell, meaning the said Walter L. Powell, did then and there commit the crime of assisting prisoners lawfully confined in the jail of said county to escape therefrom, contrary to the form of the statutes in such case made and provided and against the peace and dignity of the State of Wyoming.''

Holding that the writing was libelous *per se* and the information sufficient to constitute a charge of criminal libel, the court said:

"No objection is made to the form of the innuendos, but it is asserted that the words employed in the alleged libelous letter are not libelous *per se*. Referring to Powell, the libelee as a 'receiver' must be read in the light of the entire screed and in connection with what precedes it. If the indictment had been demurred to in the trial court, the language of the letter upon which the action is predicated must be understood in its ordinary and usual signification, and must be interpreted as men, knowing all the circumstances, would generally understand it. Cochran v. Melendy, 59 Wis. 208, citing Weil v. Schmidt, 28 Id. 139; Hemphill v. Holley, 4 Minnesota 238. A person of common understanding would readily gather from reading the letter that it charged Powell with being a receiver of stolen goods knowing them to have been stolen, although the charge of assisting prisoners to escape is not so clear. But the indictment being sufficient and the libel being unmistakable as to one of the charges, it is not necessary to pursue this inquiry in this proceeding further.''

In the case of Nash v. Fisher, 24 Wyo. 535, 162 Pac. 933, 934, an action for damages for slander, indicating the manner in which a pleading making such a charge should be regarded in determining its sufficiency, the court said:

"Considering the entire statement and the connection in which it was used, which must be done in order to arrive at its true meaning, it conveys to our minds, and we think it would naturally be understood by those who heard the words spoken, as charging the plaintiff with having unlawfully and feloniously caused the death of his first wife by starvation, and imputed to him a criminal offense involving moral turpitude and for which, if the charge were true, would subject him to infamous punishment both at common law and under the statute.''

As to what constitutes a libel, this court, in Kutcher v. Post Printing Co., 23 Wyo. 178, 147 Pac. 517, 519, 149 Pac. 552, refers to and quotes the language of well known texts to the following effect:

"In Newell on Slander and Libel (2nd Ed.) 37, after giving a large number of definitions of libel, the author says: 'In conclusion, it may be said that any publication, expressed either by printing or writing or by signs, pictures or effigies or the like, which tend to injure one's reputation in the common estimation of mankind, to throw contumely, shame or disgrace upon him, or which tends to hold him up to scorn, ridicule or contempt, or which is calculated to render him infamous, odious or ridiculous, is *prima facie* a libel, and implies malice in its publication.' And in 25 Cyc. 346, the rule is stated and supported by a long line of decisions, that 'any language, whether spoken or written, imputing want of integrity, a lack of due qualification, or a dereliction of duty to an officer or employee is actionable *per se.'* To the same effect, see 18 A. & E. Enc. Law (2nd Ed.) 949."

The Kutcher case was, like that at bar, a civil action for damages for the publication of an alleged libelous article in a newspaper. It, too, came to this court upon a judgment entered after a general demurrer to the petition had been sustained, and the plaintiff had elected to stand upon it and not plead further. Stating the rule which should govern in the situation in which that case then stood, this court said:

"Where, as in this case, the question is as to the sufficiency of the allegations of the petition to state a cause of action, it is for the court to determine whether or not a libel is set forth, but if the words alleged are fairly susceptible of a construction which would render them actionable, the pleading will be upheld and the question will be submitted to the jury. (18 A. & E. Enc. Law (2nd Ed.) 991, and cases cited.) It is also the well-settled rule that the words are to be construed according to their ordinary meaning and as it is believed they would be understood by those who read them, considered in the light of the connection in which they are used and the subject-matter of the article, and for that purpose the entire article in which they appear is to be looked to in determining whether or not they are libelous.

"Applying those rules to the case at bar, we think the language used in the published article fairly susceptible of a construction rendering it libelous, and that it would be so understood by the readers generally."

And the judgment of the District Court was reversed.

Of similar purport is the language of the Supreme Court of the United States, in Washington Post Co. v. Chaloner, 250 U. S. 290, 39 Sup. Ct. 448, 63 L. Ed. 987, where it was said:

"The applicable rule was tersely stated by the Circuit Court of Appeals, Sixth Circuit, through Judge Lurton, afterwards of this court, in Commercial Publishing Co. v. Smith, 149 Fed. 704, 706, 707, 79 C. C. A. 410, 412. Citing supporting authorities, he said:

" 'A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. So the whole item, including display lines, should be read and construed together, and its meaning and signification thus determined. When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If, upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read.' "

In that case the trial court had instructed the jury that the published item saying "C. shot and killed G. while the latter was abusing his wife, who had taken refuge at C's" home, was libelous and actionable *per se* and nothing more in effect remained except for the jury to assess the amount of damages. Holding that this language was not so free from ambiguity as to permit the lower court to declare it as a matter of law libelous *per se* and thus take

away from the jury a doubtful question of fact, the judgment below was reversed.

37 C. J. 50, Sec. 399, citing many cases in support of the view expressed, says that:

"A demurrer is a proper procedure to test the actionable character of the charge and it will only be sustained where the court can affirmatively say that the publication is incapable of any reasonable construction which will render the words defamatory."

To the same effect see Press Pub. Co. v. McDonald, 63 Fed. 238, 11 C. C. A. 155, 26 L. R. A. 53; Culmer v. Canby, 101 Fed. 195, 41 C. C. A. 302; Chanler v. Town Topics Pub. Co., et al., 161 Fed. 105, 88 C. C. A. 269; Martinson v. Freeburg, 44 N. D. 363, 175 N. W. 618.

Applying what has been said by the authorities cited above to the question before us, in our judgment there can be but one conclusion fairly reached. We are obliged, of course, for the purpose of determining the questions presented by the demurrer, to take all matters well pleaded as admitted, and for that purpose, in this case, the demurrer admits that the statements contained in the published article with respect to the plaintiff were false and were published maliciously. Is the language of the published article fairly susceptible of a construction rendering it libelous, and would its words be so understood by those who read it, when considered in the light of the connection in which they were used and the entire subject matter of the article? We are constrained to answer this question in the affirmative. The article, among other things, states that no homicide trial in Cheyenne has caused such a furore "as has that of 'Swede' Samuelson since the liberation a few days ago of the slayer of Nick Hudson. Hudson was killed with a knife during a brawl with Samuelson at the Owl Cigar Store, a reputed 'speakeasy,' October 11. Samuelson was charged with and was

brought to trial last Monday on a charge of murder in the first degree.'' The article then recounts the liberation of Samuelson by the trial judge on a motion for a directed verdict. It is thereupon stated—''since then the city has seethed with discussion of circumstances of the case and criticism of Samuelson's liberation without punishment for an admitted homicide. Everywhere * * * the case has been and is being discussed, with expression general that a miscarriage of justice took place. A predominating note has been expression of amazement that in a case in which the defendant offered to plead guilty of manslaughter'' etc. It seems to us, examining this language fairly and dispassionately in connection with the rest of the published article, that readers thereof would ordinarily understand that the publication charged that Samuelson committed a homicide in violation of law, for which he was wrongfully allowed to go unpunished. If this be not so, it is difficult to conceive what the ordinary reader would think was intended by such expressions in the article as ''miscarriage of justice,'' ''liberation without punishment,'' ''the defendant offered to plead guilty to manslaughter,'' and ''liberation, a few days ago, of the slayer of Nick Hudson.'' At the very least, the meaning of such language was ambiguous, and under the rule approved by the court of last resort of the nation, that is sufficient to carry the matter to a jury.

That our conclusion is sound as to the effect the language of the article in question would have upon the minds of its readers generally, would appear clearly to be confirmed by the view of the matter expressed in the able brief filed herein for defendants in error themselves. In it, discussing the published statement before us, we find it said: ''Now nowhere in the article in question does the statement appear that Samuelson 'murdered' Hudson.

Counsel tells the court that the readers understood the publication to mean that. He may be and probably is right but that has nothing to do with the case.'' It is then urged in the brief, as a reason why the fact that the readers of the article understood the publication to mean that Samuelson ''murdered'' Hudson ''has nothing to do with the case,'' is that where no special damages are alleged, as here, ''there is no case unless the language used, without explanation or interpretation of any kind, carries on its face the opprobrious meaning.'' But, as we have seen, under the previous decisions of this court, and the other authorities cited herein, that is not an accurate statement of the test which must control the question before us.

We are of opinion that the District Court was in error in sustaining the demurrer to the petition. It follows that the judgment must be reversed and the cause remanded to the District Court with instructions to vacate the judgment of dismissal and to overrule the demurrer.

*Reversed.*

KIMBALL, C. J., and BLUME, J., concur.